UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| FRANCES BECK o/b/o ALAN TUROPOLAC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>COMMISSIONER OF )<br>SOCIAL SECURITY, )<br>)<br>Defendant. ) | CASE NO. 1:10CV2561<br><br>MAGISTRATE JUDGE GEORGE J. LIMBERT<br><br>**MEMORANDUM OPINION AND ORDER** |

Frances Beck, on behalf of Alan Turpolac ("Plaintiff"), d.o.b. February 3, 1987, seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying his application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the decision of the Commissioner is reversed and this matter is remanded with instructions to the Administrative Law Judge ("ALJ") to reconsider the weight accorded to the opinion of Plaintiff's treating physician.

I.  **PROCEDURAL AND FACTUAL HISTORY**

On September 8, 2006, Beck filed an application for SSI on behalf of Plaintiff, who was 22 years old as of the date of the hearing in this case, alleging disability beginning May 1, 1993 due to a combination of psychological impairments diagnosed as bipolar disorder and attention deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder ("ODD"). ECF Dkt. #11-6 at 151-156.[1] The SSA denied Plaintiff's application initially and on reconsideration. ECF Dkt. #11-5 at 120-122, 126-128.

Plaintiff filed a request for an administrative hearing. ECF Dkt. #11-5 at 129. On October 7, 2009, an ALJ conducted an administrative hearing where Plaintiff was represented by counsel. ECF Dkt. #11-3 at 80-113. At the hearing, Plaintiff amended his onset date to September 8, 2006,

---

[1] Page numbers refer to "Page ID" numbers in the electronic filing system.

and the ALJ heard testimony from Plaintiff and Kevin Yi, a vocational expert ("VE"). *Id.* On October 28, 2009, the ALJ issued a Decision denying benefits. ECF Dkt. #11-2 at 69-78. Plaintiff filed a request for review, which the Appeals Council denied. *Id.* at 60-61.

On November 9, 2010, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On April 25, 2011, Plaintiff filed a brief on the merits. ECF Dkt. #7. On July 6, 2011, Defendant filed a brief on the merits. ECF Dkt. #20. No reply brief was filed.

II. **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from bipolar disorder and attention deficit hyperactivity disorder, which qualified as severe impairments under 20 C.F.R. §416.920(c). ECF Dkt. #11-2 at 71. The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1(20 C.F.R. 416.920(d), 416.925, and 416.926). *Id.*

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform the full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple repetitive tasks but not in a fast paced production environment such as an assembly line. *Id.* at 73.

The ALJ further found that Plaintiff had performed no past relevant work, but could perform the requirements of representative occupations such as laundry worker, store laborer, and housekeeping/cleaner based upon the VE's testimony. ECF Dkt. #11-2 at 77. The ALJ therefore determined that Plaintiff had not been under a disability as defined in the SSA and was therefore not entitled to SSI. *Id.*

III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

To be eligible for SSI, a claimant must be under a "disability" as defined by the Social Security Act. 42 U.S.C. §§ 423(a) & (d), 1382c(a). Narrowed to its statutory meaning, a "disability" includes physical and/or mental impairments that are both "medically determinable" and severe enough to prevent a claimant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *Id.* An SSI claimant bears the ultimate burden of establishing that he or she is disabled under the Social Security

Act's definition. *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir.1997).

Administrative regulations require a five-step sequential evaluation for disability determinations. 20 C.F.R. §§ 404.1520(a) (4), 416.920(a)(4):

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long

as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## V. ANALYSIS

In this appeal, Plaintiff contends that the ALJ committed three prejudicial errors in reaching the conclusion that Plaintiff is not disabled. First, Plaintiff contends that the ALJ erred in concluding that Turopolac's opposition defiant disorder ("ODD") and borderline intellectual functioning did not constitute severe impairments at step two of the analysis. In his second argument, he asserts that the ALJ failed to give proper weight to the opinion of Plaintiff's treating physician, Dr. Elizabeth Hill, M.D. Finally, Plaintiff argues that the ALJ erred in formulating Plaintiff's residual mental functional capacity.

At step two, Plaintiff must show that he suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." §404.1521(a). The Regulations define basic work activities as being the " 'abilities and aptitudes necessary to do most jobs,' and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) '[u]nderstanding, carrying out, and remembering simple instructions;' (4) '[u]se of judgment;' (5) '[r]esponding appropriately to supervision, co-workers, and usual work situations;' and (6) '[d]ealing with change in a routine work setting.'" *Simpson v. Comm'r Soc. Sec.*, 344 Fed. Appx. 181, 190 (6th Cir. Aug.27, 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).

At step two, the term "significantly" is liberally construed in favor of the claimant. The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §404.1520a(d). The purpose of the second step of the sequential analysis is to enable the

-4-

Commissioner to screen out "totally groundless claims." *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985). The Sixth Circuit has construed the step two severity regulation as a " *de minimis* hurdle" in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p (July 2, 1996).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two would be only harmless error. *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987). However, all of a claimant's impairments, severe and not severe, must also be considered at every subsequent step of the sequential evaluation process. See C.F.R. §404.1529(d); C.F.R. §§ 416.920(d). Here, although the ALJ did not classify Plaintiff's ODD and borderline intellectual functioning as severe impairments at step two, he nonetheless considered those impairments at all steps of the evaluation process. For instance, at step two, the ALJ recognizes that Plaintiff had been diagnosed with ODD and that IQ tests placed Plaintiff at a borderline range of functioning with lower than to be expected memory functioning based upon his intellectual capacity). ECF Dkt. #11-2, p. 71. Accordingly, the ALJ did not commit prejudicial error when he failed to characterize Plaintiff's ODD and borderline intellectual functioning as severe impairments.

Turning to Plaintiff's second argument, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). Accordingly, if that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985). When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).

Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

"When a treating physician . . . submits an opinion on an issue reserved to the Commissioner-such as whether the claimant is 'disabled' or 'unable to work'- the opinion is not entitled to any particular weight." *Turner v. Commissioner Of Social Security*, No. 09-5543, 2010 WL 2294531 at *4, (6th Cir. June 7, 2010), unreported; *see also* 20C.F.R. §416.927(e)(1). "Although the ALJ may not entirely ignore such an opinion, his decision need only explain the consideration given to the treating source's opinion." *Id*. (internal quotation and citation omitted). In *Turner*, a treating source opined that the claimant was unable to work" and was not "currently capable of a full-time 8-hour workload." *Id*. at *5. The Sixth Circuit held that the ALJ adequately

addressed the opinion in stating that it was an opinion on an issue reserved to the Commissioner. *Id*. That is precisely what the ALJ did in this case. *See* Tr. at 17.

The ALJ gave no weight to Dr. Hill's conclusion that Plaintiff was disabled because it is an opinion reserved for the Commissioner. ECF Dkt. #11-2, p. 76. The ALJ gave "less weight" to Dr. Hill's opinion regarding Plaintiff's ability to perform full-time work because he concluded that her opinion was contradicted by the evidence in the record, and because Dr. Hill provided conflicting assessments regarding Plaintiff's ability to work. *Id.*  As a consequence, the ALJ relied upon agency assessments as well as Plaintiff's own testimony at the hearing to conclude that he was capable of full-time work. *Id.*

There is no question that Dr. Hill is appropriately characterized as a treating physician. Her role as a treating physician began in 1998 and continued through the date of the hearing in October of 2009. The alleged disparity in Dr. Hill's medical reports lies in a series of assessments Dr. Hill completed from April of 2005 through June of 2007.

In April of 2005, in a questionnaire completed at the request of the State Disability Determination Agency ("SDDA"), Dr. Hill described Plaintiff (then age 18) as displaying intermittent irritability, problems with concentration, and a low frustration tolerance. ECF Dkt. #11-16, p. 449. She reported significant problems in school, adding that Plaintiff was in danger of failing. Dr. Hill further stated that Plaintiff's oppositional behavior was even more pronounced at home. On the other hand, Dr. Hill concluded that Plaintiff's symptoms had improved and that his concentration was good during the school day. *Id.* at 450.

In November of 2006, after Plaintiff had graduated from high school, Dr. Hill completed the identical form and described Plaintiff as exhibiting mild irritability, aggressive behavior, and social immaturity. She further commented that he suffered from impulse control problems, and had recently thrown a telephone at his mother. Despite improvement, Dr. Hill concluded that significant symptoms remained, and that stress exacerbated his mood swings. ECF Dkt. #11-12, p. 320-21. Then, approximately one month later, in an assessment for the Ohio Rehabilitative Services Commission, Dr. Hill acknowledged Plaintiff's bipolar disease, ODD, and ADHD, as well as his limited intellectual abilities, but nevertheless concluded that Plaintiff was capable of full time work.

ECF Dkt. 11-13, p. 346.

In a physician's statement completed on December 6, 2006 to accompany Frances Beck's application to carry Plaintiff as a dependent child on her insurance, Dr. Hill characterized Plaintiff's ADHD as moderate to severe and his developmental handicap as mild, and provided mood instability, impulsiveness, poor judgment, and his inability to manage a budget as reasons that he was incapable of self support. ECF Dkt. #11-17, p. 473. Dr. Hill wrote that Plaintiff's condition had improved but that he was still symptomatic, and that he had a life-long illness with anticipated exacerbations. *Id.*

Dr. Hill completed the SDDA assessment form for a third time on June 3, 2007. ECF Dkt. #11-13, p. 369. She once against observed irritability, poor judgment, problems with concentration, and a low tolerance for frustration typically brought on by stress. She again concluded that Plaintiff's symptoms had improved but has not been resolved. However, in the 2007 assessment, she writes for the first time that Plaintiff "cannot handle stress of work, has difficult handling stress at home." *Id.* at 371. In the same report, she wrote that Plaintiff had limited interest and was easily bored. *Id.* at 370.

In a medical source statement completed by Dr. Hill on August 9, 2009, she characterized Plaintiff's ability to make occupational adjustments as poor. The occupational adjustment categories included the ability to follow rules, use judgment, maintain attention and concentration for two hour periods, complete a normal work day and workweek without interruption from psychologically based symptoms, maintain regular work hours, deal with the supervisors, co-workers, and the public, to work in coordination or in proximity to others without distraction, and to deal with work stress. ECF Dkt. #11-17, p. 491. With respect to his intellectual functioning, she wrote that he had a fair ability to understand, remember, and carry out simple instructions, but could not handle complex instructions. *Id.* at 492. She characterized his ability to behave in an emotionally stable manner, relate predictably in social situations, and manage funds and schedules as poor. Finally, she wrote that Plaintiff had a fair ability to maintain his appearance, socialize, and to leave home on his own. *Id.* She provided the following comments in support of her conclusions: "Had 1 job but was let go after 1 hour; in summer youth program, did not return 2nd day, lied about where he was, because of

-8-

difficulty the 1st day. *Id.*

Plaintiff argues that no internal inconsistencies exist in Dr. Hill's conclusions, but, instead that Dr. Hill's notes reflect an early belief that Plaintiff could maintain full time employment, but an ultimate conclusion that he could not based upon his series of short-lived jobs after graduating from high school. Plaintiff graduated from high school in June of 2006, ranked 188 out of 272 students. ECF Dkt. #11-10, p. 272. He was evaluated for a one-week work evaluation and a one-week situational assessment by Vocational Guidance Services ("VGS") in October of 2006. ECF Dkt. #11-13, p. 347. Due to his excessive and unexplained absences, the VGS assessment could not be completed. *Id.* at 347. A few months later, on January 24, 2007, Plaintiff was was referred to AWS for vocational support. He was placed at Dave's Supermarket with supervision by an AWS job coach *Id.* at 351. His duties included bagging groceries, collecting carts from the parking lot, and blocking[2] and restocking shelves in the supermarket. According to assessments completed by Doris Walker, an AWS supervisor, on March 5 and 9, 2007, Plaintiff was unable to work at a speed consistent with competitive standards. *Id.* at 358. Walker recognized that Plaintiff was easily bored, required ongoing positive reinforcement/reassurance and that his learning disability somewhat limited his interactions.[3] *Id.* at 363. In May, 2007, Plaintiff began a food service training program through Vocational Guidance Services but did not return after the first day. *Id.* at 365. It is important to note that the first time Dr. Hill acknowledged Plaintiff's inability to maintain full time employment is in the June 2007 assessment.

The ALJ also rejected Dr. Hill's conclusions regarding Plaintiff's ability to maintain full time employment because it conflicted with Plaintiff's testimony at the hearing. According to his testimony, Plaintiff was in special education classes in school, and that although he could read a newspaper, he could not understand what he read. ECF Dkt. #11-3, p. 86. He testified that he failed the written portion of his driver's test four times and could tell the time on a clock. *Id.* at 87, 90.

---

[2]"Blocking" involves moving items to the front of the shelf with the label of the product in full view in order to assist customers in finding and reaching the products.

[3]The ALJ refused to credit Walker's assessment of Plaintiff's performance because Walker's credentials was not included in the record.

He further testified that he was not good at math. *Id.* at 87.

With respect to previous employment, he stated that he was a dishwasher at a restaurant[4], but was criticized for working too slowly, and ultimately quit the job when his bicycle was stolen. *Id.* He was also a runner at a thrift store, but was fired for working too slowly. *Id.* at 88. After being accepted into a vocational services program, Plaintiff worked as a bus boy at Bistro 185th, but he testified that he was fired because the boss' wife did not like him. He also worked as a dishwasher at Mark's Timeout Grille, and was fired from that job, but did not know the reason for his termination. *Id.* at 89.

Plaintiff has been a patient of Dr. Hill since he was fifteen years of age.[5] He admitted that he used to behave badly and break things, and that he hit his mother. He could not identify any triggers at the hearing, and claimed that he no longer had any outbursts. *Id.* at 91-92. He further testified that he never had any outbursts at work. *Id.* at 92. When asked why he had so many absences from the vocational program, Plaintiff responded that he "didn't feel like going." *Id.* at 93. He claimed that he left his 2009 summer job at the Metroparks after one day because of his asthma. *Id.;* ECF Dkt. #11-18, p. 515.

Plaintiff claimed that his medication caused headaches, dizziness, and affected his appetite. ECF Dkt. #11-3, p. 94. He further testified that his medication affects his memory and concentration, and that, as a result, he must be reminded to take the medicine. *Id.* He enjoys playing video games, and watching television and movies. *Id.* Notably, Plaintiff favorite television programs were on the Disney channel.

He testified that he has no problem getting along with people, including the customers at the

---

[4]Plaintiff worked at Fanny's Restaurant for two weeks while he was attending high school. ECF Dkt. #11-17, p. 458.

[5]Dr. Hill completed Plaintiff's discharge summary from Laurelwood Hospital on August 22, 1998. The summary indicates that Plaintiff (then age 11) was admitted on August 18, 1998 due to out of control, aggressive behavior and question of psychosis, based upon his threats to jump off of the roof of his house. ECF Dkt. #11-14, p. 388. The summary further indicates that Plaintiff's mental problems began at age three, and have manifested themselves in aggressive behavior both at home and in school, which included hitting his mother and schoolmates. Ritalin was prescribed for Plaintiff at age 6 when his ADHD was first diagnosed. *Id.* at 391. At the time he was admitted to Laurelwood Hospital, he was taking Clonidine as well. *Id.* at 390.

thrift store. *Id.* at 100-101. He stated that he enjoyed the job at the thrift store, but that he injured his back, and he was going to be fired, so he quit. He stated that he uses the bus to go shopping for movies and clothes, *Id.* at 99, but that his mother does his laundry and manages his checkbook. *Id.* at 89-90, 102.

While it is true that Dr. Hill's conclusions regarding Plaintiff's ability to work were at odds with Plaintiff's own testimony, Dr. Hill's medical notes suggest that Plaintiff may not have been forthcoming about his ongoing behavioral problems at the hearing. For instance, Dr. Hill's notes for an appointment on September 9, 2009 (approximately one month prior to the hearing) read, "Behavior - still doing stupid things, ripping things, cords, cut cord to Wii, most recent was few weeks ago, doesn't know why, no reason." ECF Dkt. #11-18, p. 512. Dr. Hill's notes from that appointment further indicate that his parents wanted him to move out of the house. As a matter of fact, Dr. Hill's notes from 2009 indicate ongoing destructive behavior. At Plaintiff's August 4, 2009 appointment, he stated that he was "do[ing] OK, however his mother indicated that he was "still out of control," cutting cords and throwing things away. At his June appointment, Dr. Hill wrote that he was calmer, "not screaming, yelling [but] still throwing things. . .breaking things." *Id.* at 485. It appears he had an outburst at a video game store. *Id.* Dr. Hill notes that Plaintiff's concentration is good for video games, but that he wanders away from his step father when he is helping him. Medical notes from Plaintiff's January 3, 2009 appointment read, "breaking things, throwing things, tore telephone off wall, broke end table, broke tv, he lies about everything." *Id.* at 487. The notes further indicate that he is belligerent and argues with his mother, and refuses to use an inhaler for his asthma because it "looks stupid." Medical notes from four appointments in 2008 report similar destructive behavior, including breaking furniture and tearing up clothing. *Id.* at 488-490.

In addition to rejecting Dr. Hill's assessment of Plaintiff's ability to maintain full-time employment, the ALJ also did not credit the psychological report of Sally Felker, Ph.D., which was completed on June 8, 2005. ECF Dkt. #11-17, p. 458. Dr. Felker concluded that Plaintiff had a serious impairment in his occupational, academic, and social functioning. The ALJ wrote that Dr. Felker's conclusions were at odds with Plaintiff's testimony regarding his ability to get along with his coworkers, and cited the fact that Plaintiff had terminated his first restaurant job because his bike

-11-

was stolen, he was not fired because of work performance.

Based on the record before the Court, the undersigned finds that the ALJ gave insufficient weight to Dr. Hill's assessment of Plaintiff's capacity to maintain full-time employment, relying for the most part upon the largely unsupported testimony of Plaintiff. Further, the ALJ ignored Plaintiff's documented problems during his short-lived employment experiences, choosing instead to rely on Plaintiff's limited success in one aspect of his job at Dave's Supermarket. The ALJ wrote:

> Dr. Hill further opined that the claimant was significantly limited in completing a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Ex. 26F). Although the claimant reportedly had difficulties in speed while participating in work activities through the Bureau of Vocational Rehabilitation, this was not a factor with work he enjoyed. Specifically pushing carts and placing them in rows. (Ex 7F, 20.)

The ALJ completely ignores the fact that "pushing carts and placing them in rows" was only one of the job responsibilities at Dave's Supermarket, and that Plaintiff's job assessment indicated that he was incapable of performing all of his other responsibilities at a competitive level.

After discounting the opinions of Dr. Hill and Dr. Felker, the AJL gave "significant" weight to the assessment of two state agency physicians, Frank J. Orosz, Ph.D., who evaluated Plaintiff on July 5, 2005, and Cindy Matyi, Ph.D, who evaluated Plaintiff on December 26, 2006. Both psychiatric review technique assessments acknowledged Plaintiff's borderline intellectual functioning, as well as his bipolar disorder, ADHD, and ODD, but found only moderate limitations in the restriction of Plaintiff's activities of daily living, difficulties in maintaining social function and concentration, persistence and pace. Furthermore, neither assessment recognized any episodes of decompensation. ECF Dkt. #11-17, p. 473; 11-12, p. 264. Both Dr. Orosz and Dr. Matyi concluded that, although Plaintiff would struggle with tasks requiring extensive concentration or close contact with others, he could perform simple tasks in a low stress environment. ECF Dkt. #11-17, p. 480; 11-12, p. 339.

The ALJ wrote:

> I give significant weight to the State agency psychiatric review technique assessment. Consistent with his impairments, the claimant has moderate limitations in activities of daily living and concentration, persistence, and pace. However, the evidence shows that claimant interacts with friends and has not experienced significant difficulty with coworkers and supervisors.

-12-

Essentially, the ALJ rejected the opinion of Dr. Hill, who treated Plaintiff for seven years in favor of the opinions of two agency doctors who examined Plaintiff each on a single occasion. While it is possible to give greater weight to an agency opinion than the opinion of a treating physician, the ALJ's articulated reasons for doing so in this case are insufficient. As a consequence, it is necessary to remand this matter to the ALJ to reconsider the weight accorded to Dr. Hill's opinion.

In Plaintiff's final argument, he contends that the ALJ, who purported to rely upon the limitations described by Dr. Orosz and Dr. Matyi in formulating his RFC, did not restrict work-related interactions to the appropriate degree. Because this matter is to be remanded in order to allow the ALJ to reconsider the weight accorded to Dr. Hill's opinion, Plaintiff's final argument is moot.

For the foregoing reasons, the decision of the Commissioner is REVERSED and this matter is REMANDED to the ALJ to reconsider the weight accorded to treating physician's opinion in this case.

DATE: February 3, 2012

                                           */s/George J. Limbert*
                                           GEORGE J. LIMBERT
                                           UNITED STATES MAGISTRATE JUDGE